1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| RICHARD MATHIS, Individually, as Special Administrator of the Estate of Joe Robinson Mathis (a/k/a Joe R. Mathis), and as Trustee of the Joe Robinson Mathis and Eleanor Margherite Mathis Trust; JAMES MATHIS; and ANTHONY MATHIS, | Case No. 2:07-cv-00628-APG-GWF **ORDER GRANTING PLAINTIFFS' MOTION FOR RECONSIDERATION** |

9
10
11
12                                   Plaintiffs,
13            v.
14      COUNTY OF LYON and RICHARD
        GLOVER, in his individual capacity,
15
16                                   Defendants.
17
18    **I.      BACKGROUND**

19            On May 14, 2007, the Plaintiffs (collectively referred to as "Mathis") filed their

20    Complaint.  (Dkt. No. 1.)  The underlying facts are well-summarized in the court's September 30,

21    2008 order (the "Prior Order") partially granting judgment on the pleadings.  (Dkt. No. 61.)

22    Briefly put, Mathis contends that Richard Glover ("Glover") the then-Public Administrator of

23    Lyon County, illegally entered the home of Joe Robinson Mathis after his death, removed

24    personal property, improperly inventoried it, and sold some of it without a hearing.  Mathis

25    claims that Glover's conduct violated the Fourth Amendment, the Due Process and Equal

26    Protection Clauses of the Fourteenth Amendment, their Nevada constitutional corollaries, and

27    various state laws.

28

Mathis brought claims against Glover and the County of Lyon (the "County") under 42 U.S.C. § 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978) (which extended Section 1983 liability to local government units, such as counties).  On September 30, 2008, the court dismissed the Fourth Amendment claims against both Glover (determining that he is entitled to qualified immunity) and the County (determining that Glover was not a final policymaker for the County in the area of securing property).  (Dkt. #61.)  The court also dismissed the Fourteenth Amendment equal protection claims against the County.  (*Id.*)  The court denied Defendants' motion to dismiss the procedural due process claims.  (*Id.* at 8.)  The court also determined that Glover is *not* entitled to qualified immunity for the procedural due process claim.  (*Id.*)  In sum, the court dismissed only the Fourth Amendment claims against Glover (First Claim for Relief) and the County (Third and Fourth Claims for Relief) and the Fourteenth Amendment equal protection claims against the County (Fifth and Sixth Claims for Relief).

Glover appealed the determination that he is not entitled to qualified immunity for the procedural due process claim.  Neither he nor the County appealed any other aspects of the Prior Order.  All proceedings in this court were stayed pending appeal.  In February 2011, the Ninth Circuit affirmed.  *Mathis v. Cnty. of Lyon*, 633 F.3d 877 (9th Cir. 2011).  About 18 months later, Mathis filed the Motion for Reconsideration presently at issue (the "Motion").  (Dkt. #158.)

In the Motion, Mathis seeks to revive the Fourth Amendment claims against the County, based upon Fed.R.Civ.P. 60(b) and the law-of-the-case doctrine.  Mathis first argues that the court's determination that Glover was not a final policymaker was clearly erroneous, and that newly discovered evidence so demonstrates.  Mathis argues in the alternative that if the court determines that Glover was *not* a final policymaker, the court should limit that determination to the Fourth Amendment claim such that the County would still face liability for the Fourteenth Amendment procedural due process claim.

The County opposes the Motion, arguing that (i) the court correctly found that Glover was not a policymaker in relation to both the Fourth Amendment and Fourteenth Amendment claims;

1 | (ii) the Motion was untimely under Fed.R.Civ.P. 60(c)(1); and (iii) reconsideration cannot be a

2 | substitute for a proper appeal.  (Dkt. #163.)

3 |      For the reasons set forth below, the court determines that Glover was a final policymaker

4 | for the County for both the Fourth Amendment and Fourteenth Amendment procedural due

5 | process claims, and thus grants the Motion.

6 | **II.    ANALYSIS**

7 |      **A.    Rule 54(b) and The Law-of-the-Case Doctrine**

8 |      Rule 54(b) permits the "entry of a final judgment as to one or more, but fewer than all,

9 | claims or parties only if the court expressly determines that there is no just reason for delay."  The

10 | Prior Order did not make this express determination, thus making the next sentence of Rule 54(b)

11 | applicable:

> Otherwise, any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities.

15 | FED. R. CIV. P. 54(b).  Put more simply, "absent an express entry of final judgment, all orders of a

16 | district court are 'subject to reopening at the discretion of the district judge.'"  *W. Birkenfeld Trust*

17 | *v. Bailey*, 837 F. Supp. 1083, 1085 (E.D. Wash. 1983) (quoting *Moses H. Cone Mem'l Hosp. v.*

18 | *Mercury Const. Corp.*, 460 U.S. 1, 12 (1983)).  The Prior Order did not dispose of all claims as to

19 | all parties and thus it may be "revised at any time before the entry of judgment" under Rule 54(b).

20 |      The district court's power to rescind, reconsider, or modify an interlocutory order also

21 | exists outside the Federal Rules of Civil Procedure.  *City of Los Angeles, Harbor Div. v. Santa*

22 | *Monica Baykeeper*, 254 F.3d 882, 886–87 (9th Cir. 2001).

> "If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute. Nothing in the Rules limits the power of the court to correct mistakes made in its handling of a case so long as the court's jurisdiction continues, i.e., until the entry of judgment.  In short, the power to grant relief from erroneous interlocutory orders, exercised in justice and good conscience, has long been recognized as within the plenary power of courts until entry of final judgment and is not inconsistent with any of the Rules."

1    *Id.* (quoting *U.S. v. Jerry*, 487 F.2d 600, 604 (3rd Cir. 1973)).  The district court's discretion to

2    reopen or reconsider an order is governed by the law-of-the-case doctrine. *Id.*  The purpose of that

3    doctrine is to "maintain consistency and avoid reconsideration of matters once decided during the

4    course of a single continuing lawsuit."  CHARLES ALAN WRIGHT ET AL., 18B FEDERAL PRACTICE

5    AND PROCEDURE § 4478 (2d ed. 2013).  "Law-of-the-case principles . . . are a matter of practice

6    that rests on good sense and the desire to protect both court and the parties against the burdens of

7    repeated arguments by indefatigable diehards."  *Id.*

8        "[T]the law of the case doctrine is subject to three exceptions that may arise when (1) the

9    decision is clearly erroneous and its enforcement would work a manifest injustice, (2) intervening

10   controlling authority makes reconsideration appropriate, or (3) substantially different evidence

11   was adduced at a subsequent trial."  *Reed v. Town of Gilbert, Ariz.*, 707 F.3d 1057, 1067 n.9 (9th

12   Cir. 2013).  Despite its seemingly limited wording, the third exception applies at any point in the

13   pre-trial or trial proceedings when "new evidence has surfaced." *Jenkins v. Cnty. of Riverside*,

14   398 F.3d 1093, 1094 n.2 (9th Cir. 2005) (internal quotation marks and citation omitted).  The

15   court's failure to properly apply these exceptions is an abuse of discretion.  *See Bailey*, 837 F.

16   Supp. at 1085.

17       The first and third exceptions are relevant here as there are two pertinent questions:

18   (1) whether the court's prior determination that Glover was not a final policymaker for the

19   County with respect to the Fourth Amendment claims was clearly erroneous and worked a

20   manifest injustice; and (2) whether new, substantially different evidence has surfaced that justifies

21   departure from the prior determination.

22       Noting the seemingly rigid analytical framework of the law-of-the-case doctrine, the court

23   keeps in mind that "[l]aw of the case should not be applied woodenly in a way inconsistent with

24   substantial justice," *U.S. v. Miller*, 822 F.2d 828, 832 (9th Cir. 1987), and that "[t]here is a

25   particularly strong tendency to 'get it right' during all trial-court proceedings before the first final

26   trial-court judgment." 18B FEDERAL PRACTICE AND PROCEDURE § 4478.  Finally, the court also

27   must consider the stage of the proceeding; stability becomes more important as the proceeding

28

4

1  nears final disposition.  *See McSurely v. McClellan*, 753 F.2d 88, 96 (D.C. Cir. 1985); *Bailey*, 837

2  F. Supp. at 1085–86.  Because the Prior Order was entered at an early phase of the proceeding

3  and the court has yet to rule on the parties' summary judgment motions, the court's concern for

4  stability is strongly tempered by its desire to "get it right."

5          **B.      Section 1983 and *Monell* Liability for Local Government Units**

6          42 U.S.C. § 1983 provides a mechanism for the private enforcement of substantive rights

7  conferred by the Constitution and federal statutes.  *Graham v. Connor*, 490 U.S. 386, 393–94

8  (1989).  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method

9  for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994)

10  (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  To state a claim under Section 1983,

11  a plaintiff must "allege the violation of a right secured by the Constitution and the laws of the

12  United States, and must show that the alleged deprivation was committed by a *person* acting

13  under color of law."  *West v. Atkins*, 487 U.S. 42, 48–49 (1988) (emphasis supplied).

14          Local government units, such as counties, are "persons" to whom Section 1983 applies.

15  *Monell*, 436 U.S. at 690.  "To hold a local government liable for an official's conduct, a plaintiff

16  must first establish that the official (1) had final policymaking authority 'concerning the action

17  alleged to have caused the particular constitutional or statutory violation at issue' and (2) was the

18  policymaker for the local governing body for the purposes of the particular act."  *Weiner v. San*

19  *Diego Cnty.*, 210 F.3d 1025, 1028 (9th Cir. 2000) (quoting *McMillian v. Monroe Cnty., Al.*, 520

20  U.S. 781, 785 (1997)).

21          **1.      Final Policymaker**

22          **a.      Legal Standard**

23          The theory of liability for local government units is not *respondeat superior*—"a

24  municipality cannot be held liable *solely* because it employs a tortfeasor."  *Monell*, 436 U.S. at

25  691 (emphasis in original).  "[I]t is when execution of a government's policy or custom, whether

26  made by its lawmakers or by those whose edicts or acts may fairly be said to represent official

27

28

                                                    5

policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.  A plaintiff may establish *Monell* liability by showing that:

> (1) conduct pursuant to an official policy inflicted the injury; (2) the constitutional tort was the result of a "longstanding practice or custom which constitutes the standard operating procedure of the local government entity;" (3) the tortfeasor was an official whose acts fairly represent official policy such that the challenged action constituted official policy; or (4) an official with final policy-making authority "delegated that authority to, or ratified the decision of, a subordinate."

*Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008) (quoting *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)).  Mathis's Third Claim for Relief alleges the third method (final policymaker), while his Fourth Claim for Relief alleges the first method (official policy) and second method (practice or custom).  (Dkt. #1 ¶¶ 57, 63, 65.)

Whether an official is a final policymaker is a question of state law to be determined by the district court before the case is submitted to the jury.[1]  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 124 ("[W]e can be confident that state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business.").  While an official may act as a "*de facto* policymaker under § 1983 without explicit authority under state law, [the court is] ordinarily 'not justified in assuming that municipal policymaking authority lies somewhere else than where the applicable law purports to put it.'"  *Lytle v. Carl*, 382 F.3d 978, 982 (9th Cir. 2004) (quoting *Praprotnik*, 485 U.S. at 126).

To make the policymaker determination, the court "[r]eview[s] the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law[.]" *Jett*, 485 U.S. at 737.  The specific questions to be answered in this review are whether the official's discretionary decisions are (1) meaningfully constrained by policies not of that official's making; (2) final, i.e., not subject to meaningful review by authorized policymakers; and (3) within the realm of the official's grant of authority.  *Praprotnik*, 485 U.S. at 127; *Toler v.*

---

[1] Whether a final policymaker's actions or decisions *caused* the deprivation of rights at issue is a question of fact for the jury.  *Jett*, 485 U.S. at 737.

*Paulson*, 551 F. Supp. 2d 1039, 1050 (E.D. Cal. 2008) (citing *Randle v. City of Aurora*, 69 F.3d 978, 984 (10th Cir. 1995)); *see Lytle v. Carl*, 382 F.3d 978, 984 (9th Cir. 2004).

"For purposes of *Monell* liability, the term 'policy' includes within its definition not only policy in the ordinary sense of a rule or practice applicable in many situations.  It also includes 'a course of action *tailored to a particular situation* and not intended to control decision in later situations.'"  *Lytle*, 382 F.3d at 984 (quoting *Pembauer v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (emphasis in original)).  Put differently, a final policymaker's single decision or act that causes a constitutional violation may be sufficient to trigger Section 1983 liability.  *Pembauer*, 475 U.S. at 480–81.  However, there must be evidence of a deliberate choice to follow the challenged course of action "from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question."  *Id.* at 483.  Whether a choice was made among various alternatives is a question of fact.  *See Quiroz v. Licalsi*, 2005 WL 3283708 at *33 (E.D. Cal. 2005).

### b.  Were the Public Administrator's decisions meaningfully constrained by policies not of his making?

Nevada law provides that, with several exceptions,[2] each county has a public administrator.  Public administrators are elected officials in their respective counties.  The statutes grant them broad power to administer estates, including the securing of a deceased's property in certain circumstances.  Nev. Rev. Stat. §§ 253.040, 253.0557 (2011).

Detailed requirements are set forth for some aspects of a public administrator's work, including bonding, compensation, administration of estates with a value below $20,000, and the donation and destruction of low-value property.  Nev. Rev. Stat. §§ 253.020, 253.040, 253.0403, 253.0407.  Other aspects are left open.  For example, public administrators are governed by the same rules and laws that govern other administrators and executors (with the

---

[2] In the counties of Humboldt, Lander, Lincoln, Storey, and White Pine, the district attorney serves as the Public Administrator; in Carson City, the Clerk of Carson City serves as the Public Administrator. Nev. Rev. Stat. § 253.010(4) (2011).

1 exception of the specific requirements of this statute).  NEV. REV. STAT. § 253.060.  They also

2 have the power to initiate all necessary legal proceedings to carry out their administrative duties.

3 NEV. REV. STAT. § 253.080.

4    NRS § 253.025 specifically prohibits *deputy* public administrators from having any

5 policymaking authority for the office of the public administrator or the county, but is silent about

6 whether the public administrator herself has any policymaking authority.  The inclusion of the

7 specific ban for deputies implies that public administrators are policymakers, an implication

8 which the legislative history strongly supports.  *See Authority of Deputies Appointed by Certain*

9 *Public Officers: Hearing on A.B. 477 Before the Comm. on Gov't Affairs*, 2005 Leg., 73d Sess.

10 (Nev. 2005) (statement of Andrew List, Exec. Director, Nev. Ass'n of Counties, "This bill . . .

11 redefines who a policymaker is as far as elected officials.  As we think it should be, the elected

12 official is the policymaker.  Deputies to that elected official should not be policymakers.").

13    As to securing property of the deceased, "the public administrator *may* secure the property

14 . . . if the administrator finds that: [1] There are no relatives of the deceased who are able to

15 protect the property; or [2] Failure to do so could endanger the property."  NEV. REV. STAT.

16 § 253.0405 (emphasis added).  Notably, this authority is permissive; the public administrator is

17 not required to secure any property.  Also, the statute expressly authorizes the public

18 administrator to decide whether grounds exist to secure the property.  In other words, the public

19 administrator has discretion to decide *whether* to secure the property.  The statutes do not provide

20 detailed requirements about *how* public administrators are to secure a decedent's property.  Thus,

21 the public administrator has discretion to determine how to secure property.  In the absence of

22 policymaking authority vested in another person or government entity, such as a county board of

23 commissioners, the public administrator would be the final policymaker for the securing of a

24 deceased's property in accord with the broad statutory scheme.

25    Accordingly, the court must examine how the statute treats county boards of

26 commissioners.  NRS § 258.091 grants them some investigative and oversight authority:

27 / / / /

28

8

1

2          1.  The board of county commissioners *shall*:

3                  (a) Establish regulations for the form of any reports made by the public
                   administrator [;]

4                  (b) Review reports submitted to the board by the public administrator [;
                   and]

5

6                  (c) Investigate any complaint received by the board against the public
                   administrator.

7          2.  The board of county commissioners *may* at any time investigate any estate for
           which the public administrator is serving as an administrator.

8

9    *Id.* § 253.091 (emphasis supplied).  The statute does not authorize the County board to dictate

10   how the public administrator is to secure property.  The statute is a form of "sunlight" provision

11   that allows the board to learn what the public administrator is doing, but it does not provide the

12   board any meaningful authority over the public administrator.  The board also has the power to

13   approve the public administrator's expenses incurred in administering estates, but the public

14   administrator's base salary is set by NRS 253.0447 and 253.050(1).

15          While the absence of authority is not necessarily a ban on policymaking, no evidence has

16   been offered to prove that the County makes policy for the securing of property.[3]  Accordingly, a

17   public administrator's discretionary decisions about how to secure property—in this case,

18   Glover's decisions to enter the Mathis home without a warrant and dispose of certain personal

19   property—are not meaningfully constrained by any policies not of the public administrator's own

20   making.  *See Praprotnik*, 485 U.S. at 127.

21                      **c.      Were Glover's decisions final?**

22          The second issue is whether the public administrator's discretionary decisions are final,

23   that is, not subject to meaningful review by authorized policymakers.  *Praprotnik*, 485 U.S. at

24   127; *Toler v. Paulson*, 551 F. Supp. 2d 1039, 1050 (E.D. Cal. 2008) (citing *Randle v. City of*

25

26                  [3] Mathis submitted new evidence with the Motion to argue that the County did not actually make
     policy in the area of securing property.  Although the court does not rely on Mathis' new evidence in this

27   Order, the court notes that the County did not present any contrary evidence to establish that anyone other
     than the Public Administrator acts as the final policymaker in this area.

28

9

1   *Aurora*, 69 F.3d 978, 984 (10th Cir. 1995)); *see Lytle v. Carl*, 382 F.3d 978, 984 (9th Cir. 2004).

2   Here, the answer is yes.  The board of county commissioners has the power to oversee and

3   monitor the public administrator's work, but does not have the power to order the public

4   administrator to alter his work.  Nor can the board directly remove the public administrator,

5   although the board can recommend that the public administrator be removed in accord with the

6   statutes applicable to all local officials.  *See* NEV. REV. STAT. §§ 283.300–283.430 (accusations

7   for removal presented by county grand jury), 283.140–283.290 (impeachment), 283.440

8   (summary removal); *Adler v. Sheriff, Clark County*, 552 P.2d 334, 335–36 (Nev. 1976) (the

9   preceding statutes apply to all local officials, including public administrators).  The board's

10  review is meaningful in the limited sense that it can learn what the public administrator is doing

11  and transmit this information to the public and other relevant parties, but the review does not alter

12  the finality of the public administrator's decisions concerning the securing of property.  More

13  specifically for purposes of this case, the board has no meaningful say as to whether and how the

14  public administrator may enter a home without a warrant, remove personal property, or sell that

15  property.

16       The evidence submitted by the County in its opposition is insufficient to demonstrate that

17  the County Board engages in any meaningful review as a practical matter.  (Doc. 163-1.)  This

18  evidence demonstrates that the County Board has performed several investigations into the

19  conduct of Glover and his successor (Jason McClean), one of which resulted in a guilty plea by

20  McClean.  (Doc. 163-1, Ex. 6.)  This demonstrates that the County is complying with its statutory

21  duties to investigate and shed light on what the public administrator is doing, but not that the

22  County Board has the direct power to alter the public administrator's behavior or impose

23  discipline.

24              **d.      Was Glover acting within the realm of his grant of authority?**

25       As to the third question—whether the public administrator acts within the realm of his

26  official grant of authority when he enters a home, removes personal property, and sells that

27  property—the answer is yes.  Because securing property is within the statutory mandate, the

28

decisions made and actions taken to secure property, even if those actions are illegal, fall within

that mandate. *See Scala v. City of Winter Park*, 116 F.3d 1396 (11th Cir. 1997) ("If [the

defendants] had *final* (i.e., nonreviewable) decision-making authority with respect to termination

decisions . . . , they would be final policymakers in that area, and thus could subject the City to

liability if the decisions they made in that capacity were illegal ones." (emphasis in original)).  Of

course the statute does not direct the public administrator to act outside the law, but *Monell*

liability is not limited to only those situations where the actions taken were legal under state law

yet violative of the federal constitution.  The court declines to interpret this issue so narrowly.  *Cf.*

*Monroe v. Pape*, 365 U.S. 167, 187 (1961) (overturning rule that only actions that were legal

under state law were performed "under color of law" and thus subject to § 1983 liability).

Based on the statutory scheme and its legislative history, the public administrator is a final

policymaker with regard to the securing of property, which includes entering a decedent's home

to inventory property, and removing, selling and otherwise disposing of property.  Glover's

policymaker status thus extends to Mathis's Fourth Amendment claims and Fourteenth

Amendment procedural due process claims.  This court's conclusion in the Prior Order that the

public administrator is not a final policymaker in the area of securing property was clearly

erroneous as a matter of law.

## 2.    State or Local Official

The next inquiry is whether Glover was "the policymaker for the local governing body for

the purposes of the particular act."  *Weiner v. San Diego Cnty.*, 210 F.3d 1025, 1028 (9th Cir.

2000) (quoting *McMillian v. Monroe Cnty. Al.*, 520 U.S. 781, 785 (1997).  For purposes of this

case, the question is whether Glover was acting on behalf of the County when he secured and sold

the property.

The Prior Order did not expressly hold that public administrators in Nevada are state

officials.  However, the court's reasoning as to why the public administrator is not a final

policymaker of the county relied in part on *McMillian*, the leading Supreme Court case on

whether an official acts for the state or local government.  The court stated that "a public

administrator is not wielding county authority, in fact, the public administrator is authorized by the state legislature and the county has little authority to grant power." [Dkt. #61 at 5]. Another part of the Prior Order, however, indicates that the court was not categorically holding that public administrators are state officials. The court determined that the Fourteenth Amendment procedural due process claim against the County survived, which implicitly determined that at least in some circumstances public administrators are county officials. (*See* Dkt. #61 at 8.) In light of the potential ambiguity of the Prior Order, whether public administrators act on behalf of the state or local government when securing property is an issue that requires clarification.

### a.        Legal Standard

In *McMillian*, the Supreme Court set forth two principles to guide the inquiry whether a final policymaker acts on behalf of the state or local government. First, the court must ask whether the government official is a "final policymaker [] for the local government in a particular area, or on a particular issue." *McMillian*, 520 U.S. at 785. Second, the "inquiry is dependent on an analysis of state law," although a state's labeling of an official as a state or county official is not dispositive. *Id.* at 786. The court's "understanding of the *actual function* of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law. *Id.* (emphasis supplied). Ultimately, the question is on whose *behalf* the public administrator acts when securing property of the deceased. *See Goldstein v. City of Long Beach*, 715 F.3d 750, 753 (9th Cir. 2013).

### b.        Application

*McMillian* concluded that county sheriffs in Alabama are state officials for the purposes of law enforcement because (i) the Alabama Constitution located the office of the "sheriff for each county" in the executive department; (ii) although sheriffs were always elected in each county under the state constitution, sheriffs' inclusion in the executive department was a result of a constitutional amendment (showing a deliberate choice to make sheriffs state officials); (iii) authority to impeach sheriffs was moved from county courts to the Alabama Supreme Court in an effort to "augment the power of the Governor;" (iv) the Alabama Supreme court interpreted

the state constitution to mean that sheriffs are officers of the state; (v) sheriffs must "attend upon" state courts and, more specifically, "execute and return the process and orders" of any state court, even if that court is in a different county; (vi) the county treasurer has no authority to direct the sheriff to take certain actions, even though the sheriff must account for the funds he receives on behalf of the county; and, quite importantly, (vii) sheriffs have complete authority to enforce state criminal law in their counties without any direction by the county commissions, as only the Governor and Attorney General can control how a sheriff fulfills her law enforcement duties.  520 U.S. at 787–91.

The Court did not see as compelling the evidence to the contrary: that a sheriff's salary is paid by the county, the county provides law enforcement equipment to sheriffs, and a sheriff's jurisdiction is limited by county. *Id.* at 791–92.  In Alabama, state judges and district attorneys are state officers and their jurisdictions are similarly limited. *Id.* at 792.  The Court determined that the weight of evidence supported the conclusion that sheriffs are state officials.

Following the *McMillian* framework, the Ninth Circuit recently concluded that the Los Angeles District Attorney is a local official for the purpose of maintaining a database of the benefits provided to jailhouse informants. *Goldstein*, 715 F.3d 750.  While California district attorneys are state officials for the purposes of law enforcement, like Alabama sheriffs, they are local officials for certain internal policies and procedures. *Id.* at 755.  The California Constitution and California Government Code locate district attorneys within the county government. *Id.* (citing CAL. CONST. art. XI, § 1(b); CAL. GOV. CODE § 24000).  District attorneys must be registered voters in their respective counties and are elected in each county. *Id.*  Also, district attorneys in California are removed from office by the same procedure as for other city and county officers. *Id.*

The court then focused on the particular duties of district attorneys and their relationship to state and county government.  The state attorney general's power over district attorneys is limited to requiring reports. *Id.* at 756.  The attorney general does not have the power to dictate policy to a district attorney, unlike the control wielded over sheriffs by the governor and attorney

1    general of Alabama.  In addition, district attorneys in California are paid out of the county

2    treasury; each county sets district attorney compensation; necessary expenses are approved and

3    paid by the county; and district attorneys must account to their respective counties for all money

4    received in an official capacity. *Id.* at 758.  Notably, the court stated that even if an official

5    exercises some functions independently of other political entities within the county, that does not

6    necessarily mean that the official is not acting for the county.  *Id.*  Finally, the court found it

7    "crucial" that counties in California are required to defend and indemnify district attorneys in

8    actions for damages.  *Id.*

9            While the role of public administrators in Nevada does not map neatly onto the role of

10   either sheriffs in Alabama or district attorneys in California, *McMillian* and *Goldstein* inform the

11   legal conclusion that public administrators in Nevada act for the county when securing property.

12   This case has many similarities to *Goldstein*.  First, the Nevada Constitution and statute define

13   public administrators as county officers. NEV. CONST. art. 4, § 32; NEV. REV. STAT. § 253.010(3)

14   (2011).  The Nevada Supreme Court recently concluded that it should look first to Article 4,

15   Section 32 of the Nevada Constitution to determine whether an official acts for the state.  *In re*

16   *Contested Election of Mallory*, 282 P.3d 739, 742 (Nev. 2012).  The court relied upon that

17   constitutional provision to determine that district attorneys are county officers, as they are listed

18   in Article 4, Section 32.  *Id.*

19           Second, NRS § 293.109 provides a list of "state officers" that does not include public

20   administrators.  Third, public administrators are removed from office by the same procedure as

21   other elected local officials; no state official has the power to directly remove public

22   administrators.  Fourth, no statute grants to any state official or agency policymaking authority

23   over public administrators.  Finally, the county board approves and pays a public administrator's

24   necessary expenses.

25           Other indicia exist that public administrators are county officials for the purpose of

26   securing property.  Even though county oversight is limited, there is no oversight at the state

27   level.  In counties where other officials act as *ex officio* public administrators, those other officials

28

14

1    are either the district attorney or city clerk, both of whom are local officials under Nevada law.

2    NEV. CONST. art. 4, § 32; NEV. REV. STAT. § 253.010(4) (2011); *see Mallory*, 282 P.2d at 742.

3    Furthermore, when the office of public administrator is vacant, the county is authorized to fill the

4    vacancy.  NEV. REV. STAT. § 253.010(5) (2011).  The counties' lack of power over public

5    administrators is similar to the impotence of county commissions in Alabama over sheriffs.  In

6    Alabama, however, the governor and attorney general exercised direct control over sheriffs, a

7    control not evident over public administrators in Nevada.  Moreover, the independence of an

8    official in a particular area does not necessarily render that official to be a state official in that

9    area—i.e., the public administrator can secure property on behalf of the county even if he or she

10   does so with complete independence from the county.  *Goldstein*, 715 F.3d at 757–58.  In

11   *McMillian*, the Alabama Supreme Court had sole power to remove sheriffs due to a deliberate

12   choice to divest such power from county courts. *McMillian*, 520 U.S. at 799.  Public

13   administrators in Nevada, however, can be removed by impeachment at the state level or by a

14   summary proceeding in court following an indictment by a county grand jury delivered to the

15   district attorney (a county officer).  NEV. REV. STAT. §§ 283.140–283.290, 283.440 (2011); *see*

16   *Adler* 552 P.2d at 335–36.

17        Quoting the Prior Order, the Defendants argue that "'a public administrator is not

18   wielding county authority, in fact, the public administrator is authorized by the state legislature

19   and the county has little authority to grant power.'"  (Dkt. #163 at 10.)  This conclusion was

20   incorrect.  All government officials' power flows from the state, whether it be the state

21   constitution, statute, or some combination of both.  For example, boards of county commissioners

22   are undoubtedly county entities, yet they are creations of the Nevada Constitution and their duties

23   are established by statute.  NEV. CONST. art. 4, § 26; NEV. REV. STAT. §§ 244.010–244.090

24   (2011).  This does not render county commissioners state officials.  The fact that counties have

25   little authority to grant power to public administrators is insufficient to render public

26   administrators state officials.  Similar to public administrators, district attorneys' authority flows

27   largely from statute, and the counties have little authority to grant power to district attorneys.  *See*

28

Nev. Rev. Stat. §§ 252.010–252.190 (2011).  Yet the Ninth Circuit has held that Nevada district attorneys are final policymakers for the county with respect to the conduct of criminal prosecutions. *Webb v. Sloan*, 330 F.3d 1158, 1165 (9th Cir. 2003); *see also Goldstein*, 715 F.3d 750 (Los Angeles District Attorney is a local official for the purpose of maintaining a database of the benefits provided to jailhouse informants).

In light of the foregoing, public administrators in Nevada are county rather than state officials in the area of securing property.  Any contrary conclusion in the Prior Order was clear legal error.

**III.     CONCLUSION**

The public administrator is a final policymaker for the county government in the area of securing property, an area which includes entering homes and deciding what to do with the personal property therein.  This court's conclusion to the contrary in the Prior Order was clearly erroneous as a matter of law and worked a manifest injustice by improperly excusing a defendant from potential liability for the serious, alleged constitutional wrongs of entering one's home without proper authorization.  In addition, denying Mathis the opportunity to proceed to a jury trial against the County for his Fourth Amendment claim was manifestly unjust.  This combination of clear legal error and manifest injustice warrants a departure from the law of the case established in the Prior Order.  *See Reed*, 707 F.3d at 1067 n.9.

The court's Prior Order may have created confusion as to the scope of Glover's final policymaker status by dismissing the Fourth Amendment claims against the County and not dismissing the Fourteenth Amendment procedural due process claim against the County.  Thus, the court now clarifies that Glover's status as final policymaker for the County in the area of securing property extends to the Fourth Amendment and Fourteenth Amendment procedural due process claims against the County.

In the Prior Order, the court dismissed those portions of the Third and Fourth Claims for Relief that related to the alleged search and seizure violations.  However, only the Third Claim for Relief relies upon Glover's status as a final policymaker; the Fourth Claim concerns County

policy and custom.  Even if Glover was not a final policymaker, he could have acted in accord with a custom or official policy such that the County would be liable under *Monell*.  Thus, the partial dismissal of the Fourth Claim was incorrect as a matter of law.

Accordingly, the court GRANTS the Motion and ORDERS the following:

1.  Glover acted as a final policymaker on behalf of the County in the area of securing property during his tenure as the Public Administrator.

2.  Glover's scope as final policymaker for the County in the area of securing property extends to the Fourth Amendment and Fourteenth Amendment due process claims against the County, as contained in the Third Claim for Relief.

3.  Under Rule 54(b), the court revises the Prior Order (Dkt. #61) such that the Third and Fourth Claims for Relief are not dismissed.

Dated this 12th day of July, 2013.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE