1
2
3
4

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

5
6
7

RICHARD MATHIS, Individually, as Special
Administrator of the Estate of Joe Robinson
Mathis (a/k/a Joe R. Mathis), and as Trustee of
the Joe Robinson Mathis and Eleanor
Margherite Mathis Trust; JAMES MATHIS;
and ANTHONY MATHIS,

8

Plaintiffs,

9

v.

10
11

COUNTY OF LYON and RICHARD
GLOVER, in his individual capacity,

12

Defendants.

Case No. 2:07-cv-00628-APG-GWF

**ORDER GRANTING IN PART AND DENYING
IN PART MOTIONS TO DISMISS AND
DENYING MOTION TO STRIKE**

(Dkt. Nos. 160, 161, 189, 190, and 199)

13
14

**I.     BACKGROUND**

15     The Court has recited the factual background of this case on multiple occasions.  (Dkt.

16    Nos. 61, 186.)  The following is a brief recitation of the relevant, uncontested facts as best the

17    Court can determine from the pleadings and the moving papers.  Additional facts are discussed as

18    necessary in the analysis below.

19     On May 29, 2006, Deputy Sheriff Abel Ortiz ("Ortiz") discovered Joseph R. Mathis

20    ("Joseph") deceased in his home in Wellington, Nevada.  Ortiz pronounced Joseph dead on the

21    scene and called a funeral home to remove the body.  After the body was removed, Ortiz locked

22    and sealed the home.

23     Joseph had three sons: Richard Mathis ("Richard"), James Mathis ("James"), and Anthony

24    Mathis ("Anthony") (collectively, the "Mathis Brothers," "Brothers," or "Plaintiffs").  Richard is

25    the trustee of the Joe Robinson Mathis and Eleanor Margherite Mathis Trust (the "Mathis Trust")

26    and the special administrator of Joseph's estate.  At the time of Joseph's death, David McNinch

27    was the successor trustee to the Mathis Trust.  Richard was appointed interim trustee on July 17,

28    2006.

Later in the day on May 29, 2006, Ortiz unsuccessfully attempted to contact Richard Mathis, who lived in Las Vegas.  He then was able to contact James in Washington state and Anthony in Quebec, Canada.  The precise details are inconsistent, but either James or Anthony informed Ortiz that they would arrive in Wellington within several days.

On May 30, 2006, Ortiz contacted Richard Glover, the elected Public Administrator of Lyon County and informed him of Joseph's death.  Without notifying the Mathis Brothers, Glover entered Joseph's home to locate and weapons and valuables.  He removed some of the personal property from the House and took it to his storage locker.

Upon their arrival in Wellington, the Mathis Brothers obtained counsel and were able to recover some of the personal property that Glover had seized.  The Mathis Brothers filed a missing property report with the Sheriff's Department and requested an investigation into Glover's conduct.  Ultimately, criminal charges were not filed against Glover.  Glover gave the Mathis Brothers an inventory list of everything he had seized, but the list proved inaccurate when Glover later returned an unlisted archery bow that he found in his storage unit.  Plaintiffs contend that Glover still retains some of their personal property and that he tried to sell some of it at a public auction.

On May 14, 2007, the Mathis Brothers filed the Complaint in this Court asserting various state and federal claims for relief.  Glover faces federal claims under 42 U.S.C. § 1983 for alleged violations of the Fourth Amendment and the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  For Glover's alleged constitutional violations, Lyon County faces § 1983 claims under the doctrine of municipal liability established by *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978).  The state law claims include conversion, trespass to land, and breach of fiduciary duty against Glover, and negligent supervision against the County.

On September 9, 2008, the Court dismissed the Equal Protection claims. (Dkt. No. 61.) The Court held that Glover is entitled to qualified immunity for the Fourth Amendment claims, but not for the Fourteenth Amendment due process claims.  The Ninth Circuit upheld the denial of qualified immunity, and did not address the grant of qualified immunity.  *Mathis v. Cnty. of*

*Lyon*, 633 F.3d 877, 879 (9th Cir. 21011).  The Court also held that Glover was not a final-policymaker in his role as Public Administrator, thereby precluding one method of establishing municipal liability under *Monell*.

On October 12, 2012, the County moved for summary judgment. (Dkt. No. 159.)  On October 15, Glover moved for summary judgment (Dkt. No. 160), and Plaintiffs moved for partial summary judgment as to the procedural due process claims and the state law negligent supervision claim. (Dkt. No. 161).

On July 12, 2013, the Court reconsidered its earlier dismissal order (Dkt. No. 61), and held that Glover was a final policy-maker for the County in the area of securing property of a deceased. (Dkt. No. 186.)

Subsequently, the County submitted a renewed motion for summary judgment (Dkt. No. 189), which rendered moot their prior summary judgment motion (Dkt. No. 159), and Plaintiffs filed a motion for partial summary against Lyon County as to the search and seizure claims (Dkt. No. 190).  This Order resolves the outstanding motions for summary judgment: docket nos. 160, 161, 189, and 190.

## II.   ANALYSIS

### A.   Standing / Real-Party-in-Interest

A trust is properly viewed as an entity with enforceable civil rights. *See Marin v. Leslie*, 337 F. App'x 217, 219–20 (3d Cir. 2009); RESTATEMENT (THIRD) OF TRUSTS § 2 cmt. a (2003).  A trust, however, like a corporation, is not a natural person capable of taking action on its own behalf.  The trustee is the person so empowered, and may sue on behalf of the trust to accomplish the purposes of the trust or otherwise protect the property held in trust. NRS §§ 163.023, 163.4147.  "As a general proposition, the creation of a trust divides title to the trust property, placing legal title in the trustee and equitable title in the beneficiary." 76 AM.JUR. 2d *Trusts* § 258 (2010), *cited in Goodrich v. Briones (In re Schwarzkopf)*, 626 F.3d 1032, 1039 (9th Cir. 2010).  In federal court, a trustee of an express trust may sue in her own name without joining the trust on whose behalf the action is brought. FED. R. CIV. P. 17(a)(1)(E).

1    Richard Mathis was not appointed as interim trustee until July 17, 2006—about six weeks

2    after his father's death.  (Dkt. No. 198-1 at 2.)  The trustee at the time of Joseph's death was

3    McNinch. (Dkt. No. 194-5 at 10–11.)  Nonetheless, Richard has capacity to enforce the purposes

4    of the Mathis Trust—care and protection of the Trust Property[1] for the ultimate benefit of the

5    beneficiaries.  The County has not presented any authority to support its position that a trust's

6    claim for relief may be brought only by the trustee in place at the time of the injury.  If that were

7    so, an apathetic trustee could unfairly deprive the beneficiaries of relief for harm to trust property.

8    There may be some temporal cut-off for claims related to past injuries, but this case does not so

9    concern the Court.

10    In addition, the three Mathis Brothers, as beneficiaries, have equitable interests that this

11    Court can enforce. *See In re Schwarzkopf*, 626 F.3d at 1039.  By operation of Joseph's will (Dkt.

12    No. 194-4) and the trust instrument (Dkt. No. 194-5), they have vested equitable interests in the

13    Trust Property and are "regarded as the real owner[s] of [the] property." *See id.* (applying

14    California law); *Expert Masonry, Inc. v. Boone County, Ky.*, 440 F.3d 336, 338–39 (6th Cir.

15    2006) (vested property interests are protected by Due Process Clause); *Hardesty v. Sacramento

16    Metro. Air Quality Mgmt. Dist.*, 935 F. Supp. 2d 968 (2013).  Under the Trust Instrument, there

17    appears to be no contingency capable of divesting the Mathis Brothers of their 1/6 mandatory

18    interest in the Trust Property. (*See* Dkt. No. 194-5.)  In other words, the trustee had and has no

19    discretion to *not* distribute the 1/6 shares in the Trust Property to the Brothers. NRS

20    § 163.4185(1)(a).

21    To the extent the Trust Property was still held in trust at the time of the alleged violations

22    or possessed by the Public Administrator (and thus incapable of distribution), the Mathis Brothers

23    have enforceable rights as beneficiaries with vested equitable interests in the Trust Property.  To

24    the extent the Trust Property had already been distributed at the time of the alleged violations, the

25    Mathis Brothers have enforceable rights as partial title owners of the Trust Property.  Under either

---

[1] "Trust Property" refers to the Mathis House and all personal property therein that belonged to Joseph.

4

1   formulation, the Mathis Brothers have standing to sue.  Finally, the Mathis Brothers have

2   enforceable rights in relation to their personal property that was stored at the Mathis House.

3          **B.**       **<u>Summary Judgment Standard</u>**

4         The Federal Rules of Civil Procedure provide for summary adjudication when the

5   pleadings, depositions, answers to interrogatories, and admissions on file, together with the

6   affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is

7   entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  Material facts are those that may

8   affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A

9   dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to

10  return a verdict for the nonmoving party. *See id.*  "Summary judgment is inappropriate if

11  reasonable jurors, drawing all inferences in favor of the nonmoving party, could return a verdict

12  in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th

13  Cir. 2008) (citing *United States v. Shumway*, 199 F.3d 1093, 1103–04 (9th Cir. 1999)).  A

14  principal purpose of summary judgment is "to isolate and dispose of factually unsupported

15  claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

16        In determining summary judgment, a court applies a burden-shifting analysis.  "When the

17  party moving for summary judgment would bear the burden of proof at trial, it must come

18  forward with evidence which would entitle it to a directed verdict if the evidence went

19  uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the

20  absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage*

21  *Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted).  In contrast,

22  when the nonmoving party bears the burden of proving the claim or defense, the moving party

23  can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the

24  nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a

25  showing sufficient to establish an element essential to that party's case on which that party will

26  bear the burden of proof at trial. *See Celotex*, 477 U.S. at 323–24.  If the moving party fails to

27  meet its initial burden, summary judgment must be denied and the court need not consider the

28  nonmoving party's evidence. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

At summary judgment, a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249. The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

## C.     Federal Claims — 42 U.S.C. § 1983

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …

Section 1983 provides a mechanism for the private enforcement of substantive rights conferred by the U.S. Constitution and federal statutes. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).  Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).  "To state a claim under § 1983, a plaintiff must [1] allege the violation of a right secured by the Constitution and laws of the United

1   States, and must [2] show that the alleged deprivation was committed by a person acting under

2   color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

3       Plaintiffs' remaining Section 1983 claims are under the Fourth Amendment and the Due

4   Process Clause of the Fourteenth Amendment.  The Fourth Amendment is applicable against state

5   and local governments by incorporation through the Fourteenth Amendment. *Colorado v.*

6   *Bannister*, 448 U.S. 1, 2 (1980).  This Court previously held that Glover enjoys qualified

7   immunity for the Fourth Amendment claims. (Dkt. No. 61.)  Conversely, the Court held that he

8   does not enjoy qualified immunity for the Fourteenth Amendment procedural due process

9   claims—a holding the Ninth Circuit affirmed. *Mathis*, 633 F.3d at 879.  Qualified immunity is not

10  a defense available to local government units, such as counties. *Eng v. Cooley*, 552 F.3d 1062,

11  1064 n.1 (9th Cir. 2009).  Thus, the County may be liable for Glover's alleged constitutional

12  violations notwithstanding any personal immunity he enjoys.

13      In *Monell*, the Supreme Court held that local government units are "persons" for the

14  purposes of Section 1983. 436 U.S. at 690.  A plaintiff may establish *Monell* liability by showing

15  at least one of the following:

16      (1) conduct pursuant to an official policy inflicted the injury; (2) the constitutional
        tort was the result of a "longstanding practice or custom which constitutes the
17      standard operating procedure of the local government entity;" (3) the tortfeasor
        was an official whose acts fairly represent official policy such that the challenged
18      action constituted official policy; or (4) an official with final policy-making
        authority "delegated that authority to, or ratified the decision of, a subordinate."
19

20  *Price v. Sery*, 513 F.3d 962, 966 (9th Cir. 2008).  Plaintiffs assert claims under the first and third

21  of these methods (official policy and final policy-maker).  "Generally, a municipality is liable

22  under *Monell* only if a municipal policy or custom was the 'moving force' behind the

23  constitutional violation. . . . In other words, there must be 'a direct causal link between a

24  municipal policy or custom and the alleged constitutional deprivation.'" *Villegas v. Gilroy Garlic*

25  *Festival Ass'n*, 541 F.3d, 950, 957 (9th Cir. 2008) (quoting *City of Canton v. Harris*, 489 U.S.

26  378, 385 (1989)).

27      As to the first method, the plaintiff must prove that the official "committed the alleged

28  constitutional violation pursuant to a formal governmental policy or a 'longstanding practice or

7

1    custom which constitutes the *standard operating procedure* of the local government entity.'"

2    *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992) (quoting *Jett v. Dallas Indep. Sch. Dist.*,

3    491 U.S. 701, 737 (1989) (emphasis added)).  Whether the official acted pursuant to policy or

4    custom is a question of fact. *Villegas*, 541 F.3d at 964.

5         Concerning the third method, "[a] single decision by a municipal policymaker may be

6    sufficient to trigger section 1983 liability under *Monell*, even though the decision is not intended

7    to govern future situations." *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1992).  However,

8    "[m]unicipal liability under section 1983 attaches only where 'a deliberate choice to follow a

9    course of action is made from among various alternatives by the official or officials responsible

10   for establishing final policy with respect to the subject matter in question.'" *Id.* (quoting *Pembaur*

11   *v. City of Cincinnati*, 475 U.S. 469, 483–84 (1986)).  Whether a deliberate choice was made

12   among various alternatives is a question of fact. *See Quiroz v. Licalsi*, 2005 WL 3283708 at *33

13   (E.D. Cal. 2005).

14        The Court previously held that Glover was a final policy-maker for the County in the area

15   of securing property during his tenure as Public Administrator.  For *Monell* liability to attach

16   under the final-policymaker theory then, the dispositive questions are (1) whether Glover

17   committed the alleged constitutional violations; and (2) whether he deliberately chose to take the

18   actions constituting those violations from among various alternatives.  On summary judgment, the

19   Court must determine whether there any genuine disputes of fact that a jury must resolve

20   regarding either of these two questions. Fᴇᴅ. R. Cɪᴠ. P. 56(a).

21   **1.    Fourth Amendment (Third and Fourth Claims for Relief)**

22        Plaintiffs allege an unconstitutional search of the Mathis House and an unconstitutional

23   seizure of personal property found therein.  At the time of the alleged violations, the House was

24   held in the Mathis Trust.  Some of the personal property belonged to Joseph (and thus the Mathis

25   Trust upon his death) and some belonged to the brothers (who were storing it at the Mathis

26   House).

27        To prevail on a Fourth Amendment claim for an unconstitutional search or seizure, the

28   plaintiff must prove that (1) she had a legitimate expectation of privacy in the place searched or

8

property seized; and (2) the search or seizure was unreasonable. *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  The Court assesses the Fourth Amendment violation in relation to the County's possible liability under *Monell*, as Glover has qualified immunity for the Fourth Amendment claim.  The first issue to determine the County's liability is whether Glover violated the Fourth Amendment, which necessitates asking if Plaintiffs have Fourth Amendment "standing" and if the search was reasonable.

### a.      Legitimate Expectation of Privacy / "Standing"

"To invoke Fourth Amendment protection, Plaintiffs must have both a subjective and an objectively reasonable expectation of privacy." *Katz v. U.S.*, 389 U.S. 347, 361 (1967).  A property interest alone is insufficient. *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1035 (9th Cir. 2012).  "There must also be an objectively reasonable expectation of privacy in that property interest." *Id.*  "In order to determine whether an expectation of privacy is reasonable, '*Katz* posits a two-part inquiry: first, has the individual manifested a subjective expectation of privacy in the object of the challenged search?  Second, is society willing to recognize that expectation as reasonable?'" *Id.* (quoting *Cal. v. Ciraolo*, 476 U.S. 207, 211 (1986)).  The necessity of a reasonable (i.e., legitimate) expectation of privacy is also referred to as Fourth Amendment "standing." *Minn. v. Carter*, 525 U.S. 83, 87 (1998).

Courts may consider various factors to determine whether a claimant had a legitimate expectation of privacy.  The ability to exclude others weighs strongly in favor of claimants, although it is not necessary to establish an exclusive possessory interest. *U.S. v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 757 (9th Cir. 2009).  A person who stores items in another's home may have a legitimate expectation of privacy in that home, depending on circumstance and factors such as whether periodically checking on the property is permitted. *See U.S. v. Davis*, 932 F.2d 752, 757 (9th Cir. 1991) (citing *U.S. v. Harwood*, 470 F.2d 322 (10th Cir. 1972)).  However, mere ownership of stored items is insufficient to entitle the property's owner to challenge the search of the area in which the property was found. *Currency*, 554 F.3d at 757–58.  The Court also may consider the severity of the intrusion in determining whether Plaintiffs had a legitimate expectation of privacy. *U.S. v. Nerber*, 222 F.3d 597, 599–600 (9th Cir. 2000).

9

The home receives the greatest protection under the Fourth Amendment. *Payton v. N.Y.*, 445 U.S. 573, 585 (1980) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (internal quotation marks and citation omitted)). Consequently, the showing required to establish a legitimate expectation of privacy in the home is less than in a commercial or other non-residential space.

Fourth Amendment standing is a mixed question of law and fact; where the facts are stipulated or are found by a fact-finder, the court determines as a matter of law whether the claimant had a legitimate expectation of privacy in the place searched. *See U.S. v. Singleton*, 987 F.2d 1444, 1447 (9th Cir. 1993). On summary judgment then, the issues are whether there is a genuine dispute as to the Plaintiffs' subjective expectation that the Mathis House would not be subject to governmental intrusion and whether society views this expectation as objectively reasonable.

Upon Joseph's death (and before distribution of the Trust Property), the trustee had legal authority to exclude others from entering the House. Although McNinch, the then-trustee, did not take any overt acts to manifest an expectation of privacy, the owner of a home (or its representative, as in this case), is presumed to subjectively expect privacy in the home. *Katz v. U.S.*, 389 U.S. 347, 362 (1967) ("[A] man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the 'plain view' of outsiders are not 'protected' because no intention to keep them to himself has been exhibited."). The Court determines that, as a matter of law, the owner (the Trust, for the benefit of the beneficiaries) had a legitimate expectation of privacy in the Mathis House. To the extent the Mathis House was already distributed in 1/6 shares to the Mathis Brothers, they had a legitimate expectation of privacy in the home as well.

The same is true for the Mathis Brothers concerning their stored personal property. It is undisputed that they had their father's permission to store the items there. It is also undisputed that upon Joseph's death, the Brothers acquired a vested equitable interest in the home which would shortly mature into an ownership and possessory interest. Partial ownership in the location where property is stored is sufficient to confer Fourth Amendment standing. *See Currency*, 554

1  F.3d at 757–58.  The Mathis Brothers had a legitimate expectation of privacy in the Mathis House

2  related to their personal property stored therein.

3       In sum, Plaintiffs have standing to challenge the search under the Fourth Amendment, as a

4  matter of law.[2]

5                     **b.        Reasonableness of the Search and Seizure**

6        "It is a basic principle of Fourth Amendment law that searches and seizures inside a home

7  without a warrant are presumptively unreasonable." *Payton*, 445 U.S. at 586 (internal quotation

8  marks and citation omitted). *See also Donovan v. Dewey*, 452 U.S. 594, 608 (1981) (Rehnquist,

9  J., concurring) ("Absent consent or exigent circumstances, the government must obtain a warrant

10 to conduct a search … in a private home.").  This requirement applies to administrative searches

11 as well as law enforcement searches. *Camara v. Municipal Court of City & County of San*

12 *Francisco*, 387 U.S. 523, 534 (1967).  Defendants counter this longstanding presumption with the

13 assertions that (i) a warrant was not required because Anthony Mathis consented to the search;

14 (ii) a warrant was not required because there were exigent circumstances; (iii) a warrant was not

15 required under the community caretaking doctrine; and (iv) Glover relied in good-faith on a

16 Nevada statute authorizing the search.

17                     **i.        Consent**

18       The County relies on Anthony Mathis's declaration to argue that he consented to the

19 search. (Dkt No. 198 at 16.)  He testified that Deputy Ortiz told him that Ortiz would contact

20 Glover.  But the fact that Anthony was aware of Glover's potential involvement does not mean

21 that Anthony knew that Glover intended to enter the House and remove property.  There remains

22 a question of fact as to whether Anthony consented.  It is also unclear whether Anthony had

23 authority to consent to a search of the home and seizure of property.  The House was held in trust,

24 and Richard (not Anthony) was the trustee.

25

26

27       [2] Even if Glover mistakenly believed that all of the seized personal property belonged to Joseph
(and thus was held in trust upon his death), that mistake of fact would not alter the "standing" analysis

28 because the Mathis Brothers have standing in their own right in relation to their personal property.

### ii.    Exigent Circumstances

In the law enforcement context, exigent circumstances are present where a crime is in progress, police are chasing a fleeing felon, or there is a substantial risk of the destruction of contraband or evidence. *Huff v. City of Burbank*, 632 F.3d 539, 545–46 (9th Cir. 2011), *reversed on other grounds sub nom. Ryburn v. Huff*, 132 S. Ct. 987 (2012).  Ongoing fires are deemed exigent circumstances that allow firefighters to enter a structure without a warrant for the purpose of extinguishing the fire. *Id.* at 545.  Notably, however, return visits by the fire department to investigate for arson require a warrant. *Michigan v. Tyler*, 436 U.S. 499, 511 (1978).  Once the immediate danger is over, the government may not return without a warrant (unless another exception to the warrant requirement applies).  Whether exigent circumstances justify a warrantless search is a mixed question of law and fact. *U.S. v. Mancinas-Flores*, 588 F.3d 677, 687 (9th Cir. 2009).

Here, it is undisputed that the House contained weapons and other valuables and that Joseph was known in the community to be a jeweler who worked at home.  Nor is it disputed that Deputy Ortiz sealed the property after removing Joseph's body.  Even if the County's version of the facts is true, the circumstance Glover faced was nowhere near the level of imminent danger or risk of harm necessary to find exigent circumstances.  As a matter of law, exigent circumstances did not obviate the need for a warrant in this case.

### iii.    Community Caretaking Doctrine

The "community caretaking doctrine" allows police officers to impound vehicles that jeopardize public safety and the efficient movement of vehicular traffic. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1025 (9th Cir. 2009) (internal quotation marks and citation omitted).  The County admits that this doctrine has not been extended to protect non-law-enforcement defendants, yet argues that it should apply in this case because the weapons in the Mathis House presented a danger to the community.  The doctrine is too narrow in scope to justify extending it as far as the County suggests.  "Whether an impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft." *Miranda v. City*

*of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005).  The weapons were locked inside of a home that had been sealed by the Sheriff's Department.  Although it is conceivable that someone knew the weapons were in an unattended home and thus ripe targets for theft, the community caretaking doctrine is premised on a much more immediate harm to the public.  As a matter of law, the community caretaking doctrine does not excuse Glover's failure to obtain a warrant.

### iv.   Good-Faith Reliance on State Law

The County argues that the search and seizure were authorized under NRS § 253.0405.[3] Plaintiffs argue to the contrary, and that NRS § 259.150[4] specifically precluded Glover's entry into the Mathis House.  These arguments are misplaced, however.

The County is correct that qualified immunity protects individuals who reasonably misunderstand the law. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The … dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."); *Catlin v. City of Wheaton*, 574 F.3d 361, 369 (7th Cir. 2009) ("[Q]ualified immunity protects [officers] from liability where they reasonably misjudge the legal standard[.]"); MARTIN A. SCHWARTZ, 1A SECTION 1983 CLAIMS & DEFENSES § 9A.04[B][1] (4th ed. 2013).  But the Court has already held that Glover has qualified immunity for the Fourth Amendment claims, and "local government units are not entitled to the qualified-immunity defense." *Burke v. Cnty. of Alameda*, 586 F.3d

---

[3] In 2006, when the events at issue occurred, NRS § 253.0405 provided:

Before the issuance of the letters of administration for an estate, before filing an affidavit to administer an estate pursuant to NRS 253.0403 or before petitioning to have an estate set aside pursuant to NRS 253.0425, the public administrator may *secure* the property of a deceased person if the administrator finds that:

1. There are no relatives of the deceased who are able to protect the property; *and*

2. Failure to do so could endanger the property.

NRS § 253.0405 (1999) (emphasis added).  The "and" was amended to "or" in 2009.  2009 Nev. Laws Ch. 416 (S.B. 194) (2009).

[4] NRS § 259.150(2) provides that after a coroner seals the home of a decedent who "lived alone under circumstances indicating that no other person can reasonably be expected to provide immediate security for the deceased's property," only "the coroner, the coroner's deputy, a law enforcement officer or the executor or administrator of the deceased's estate" may enter the home.

1    725, 734 (9th Cir. 2009).  Even if NRS § 253.0405 authorized the search—or if Glover

2    reasonably believed the statute authorized the search—the County is liable under *Monell* if the

3    search violated the Fourth Amendment and was performed in accord with County policy,

4    practice, or custom.

5          As to the Fourth Amendment violation itself, good-faith reliance on state law is not an

6    established exception to the warrant requirement. *See* 3 WAYNE R. LAFAVE, SEARCH & SEIZURE

7    § 6.6(c) (5th ed. 2013) (warrantless entry generally requires "a compelling urgency").  Good-faith

8    reliance can trigger the exclusionary rule in criminal cases. *See Ill. v. Krull*, 480 U.S. 340 (1987).

9    But that is a rule of evidence, not liability, and its use is extremely limited in civil cases. *See U.S.*

10   *v. Janis*, 428 U.S. 433, 456 (1976) ("intrasovereign" violations); *U.S. v. $493,850.00 in U.S.*

11   *Currency*, 518 F.3d 1159, 1164 (9th Cir. 2008) (civil forfeiture cases); *Gonzalez-Rivera v. I.N.S.*,

12   22 F.3d 1441, 1448 (9th Cir. 1994) ("[B]ecause the deterrent effect of applying the exclusionary

13   rule in civil cases is minimal and its cost is significant, as a general rule, evidence obtained in an

14   unlawful manner will not be excluded from civil proceedings.").  The Ninth Circuit has not

15   determined whether the exclusionary rule applies to § 1983 causes of action, but the Fifth Circuit

16   has held that it does not. *Willis v. Mullins*, 809 F. Supp. 2d 1227, 1234 (E.D. Cal. 2011) (citing

17   *Wren v. Towe*, 130 F.3d 1154, 1158 (5th Cir. 1997)).  Moreover, although private party

18   defendants acting under color of law may be entitled to a defense of subjective good-faith reliance

19   on state law, that potential defense is irrelevant because Glover was acting as a government

20   official when he committed the alleged violations. *See Wyatt v. Cole*, 504 U.S. 158, 169 (1992).

21         In short, whether Glover relied in good faith on NRS § 253.0405 is irrelevant for purposes

22   of determining the County's *Monell* liability for Glover's alleged violations of the Fourth

23   Amendment.

24         As to Plaintiffs' assertion that Glover's alleged violations of NRS §§ 259.0405 and

25   259.150 establish a constitutional violation, that argument fails because it is possible to violate

26   state statute without also violating the federal Constitution.

27

28

Because there remains a genuine dispute of fact as to whether the Mathis Brothers consented to the search and seizure during their phone calls with Ortiz, summary judgment in Plaintiffs' favor is not appropriate. FED. R. CIV. P. 56(a).

### 2. County's Liability Under *Monell* for Glover's Alleged Fourth Amendment Violation

However, the Court must nonetheless address whether Glover acted in accord with County custom, policy, or practice. If, as to that issue, there are no genuine issues of material fact and the County is entitled to judgment as a matter of law, then summary judgment would be appropriate.

### a. Custom or Policy

Factual questions remain about whether the County had a custom or policy of allowing the public administrator to illegally enter homes and remove property found therein. Plaintiffs put forth evidence of other wrongdoing by public administrators that is quite similar to Glover's conduct. The County responds that it took appropriate action in each instance of wrongdoing. Plaintiffs' evidence, although uncontroverted on its face, would not be sufficient for a directed verdict because it does not go so far as to demonstrate that Glover's conduct represented the County's "standard operating procedure." *Price*, 513 F.3d at 962; *Darden*, 213 F.3d at 480. Thus, whether the County had a custom or policy of allowing the public administrator to illegally enter homes and remove property is a question of fact for the jury.

### b. Final Policy-Maker

Likewise, fact questions remain concerning *Monell* liability arising from Glover's status as a final policy-maker. On the undisputed facts, it appears that Glover chose from among various alternatives. He could have contacted one of the Mathis Brothers before entering the home; he could have sought a warrant; and he could have had more extensive communication with Deputy Ortiz to investigate Ortiz's conversations with Anthony and James to ascertain whether consent to a warrantless search was established. Whether Glover did, in fact, choose from among various alternatives is an issue is for the jury to resolve, however.

**3.**      **Fourteenth Amendment Procedural Due Process**

     **a.**      **Glover's Liability (Second Claim for Relief)**

In *Mathis v. County of Lyon*, the Ninth Circuit held that "[t]he right to notice and hearing prior to a public official's administrative taking is clearly established." 633 F.3d at 879.  Based on this statement of law, the Ninth Circuit held that Glover did not have qualified immunity for the Fourteenth Amendment procedural due process claims in this case. *Id.*  This statement of law, applied to the undisputed facts of this case, render Glover individually liable for violating Plaintiffs' Fourteenth Amendment due process rights.  It is uncontroverted that Glover entered the home and seized personal property without first notifying any of the Mathis Brothers of his intentions and without giving them an opportunity to be heard.  The Court need not address the nature of the required "hearing" in this context because there was no notice.

Accordingly, the Court grants summary judgment in Plaintiffs' favor on this claim.  The Court independently reaches this holding without consideration of the Ninth Circuit's statement that "the failure to give notice and an opportunity to respond before Glover took the items from the house violates due process."

     **b.**      **County's Liability Under *Monell* for Glover's Alleged Fourteenth Amendment Violation (Third and Fourth Claims for Relief)**

Despite this, Plaintiffs are not entitled to summary judgment against the County under *Monell*.  As with the Fourth Amendment claim, fact issues remain as to whether Glover's search and seizure without notice and an opportunity to respond represent the County's standard operating procedure.

Likewise, the issue of whether Glover deliberately chose from various alternatives is for a jury to resolve.  Although it appears he made such a choice—as he could have expended a greater effort to reach one of the Mathis Brothers to explain his role and that he intended to enter and seize—the issue is not conclusively established such that the Court can decide the issue as a matter of law.  Summary judgment is thus inappropriate on the claim for *Monell* liability against

the County for Glover's violation of Plaintiffs' Fourteenth Amendment right to procedural due process. FED. R. CIV. P. 56(a).

**D.    State Law Claims**

The County moved for summary judgment on the Fifteenth Claim for Relief (negligent supervision and training). (Dkt. No. 189 at 26.)  Plaintiffs assert that this is not a state law claim but rather a *Monell* claim asserting municipal liability for failure to train.  As the Complaint clusters this claim with various state law claims and fails to even mention *Monell* or Section 1983 in relation to this claim, the Court agrees with the County that this claim should be treated as a claim under state law.

Glover moved for summary judgment on the other state law claims. (Dkt. No. 160.)  His broad argument is that most of these claims require proof that he actually took and retained property belonging to Plaintiffs, and that Plaintiffs' list of missing items allegedly taken by him is insufficient because "opportunity alone is not enough to demonstrate the existence of a genuine dispute as to whether [he] took and retain[ed] the property." (*Id.* at 20.)  Glover also contends that Plaintiffs' claims have various other defects. (*Id.*)  Plaintiffs respond that there is more evidence than "opportunity alone" to demonstrate that Glover took and retained the property at issue.  The Court addresses each claim in turn.

**1.    Intentional Infliction of Emotional Distress (Seventh Claim for Relief)**

Under Nevada law, the tort of intentional infliction of emotional distress ("IIED") has three elements: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress; (2) severe or extreme emotional distress suffered by the plaintiff; and (3) actual or proximate causation." *Jordan v. State ex. rel. Dep't of Motor Vehicles & Pub. Safety*, 110 P.3d 30, 52 (Nev. 2005), *abrogated on other grounds by Buzz Stew, LLC v. City of N. Las Vegas*, 181 P.3d 670 (Nev. 2008).  To be extreme and outrageous, conduct must be "outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community." *Kahn v. Morse & Mowbray*, 117 P.3d 227, 237 n.18 (Nev. 2005) (internal quotation marks and citations omitted).  "[P]ersons must necessarily be expected and required to be hardened ... to occasional acts that are definitely inconsiderate and unkind." *Maduike v. Agency*

1    *Rent-a-Car*, 953 P.2d 24, 26 (Nev. 1998) (internal quotation marks and citations omitted).  Also,

2    "[t]he less extreme the outrage, the more appropriate it is to require evidence of physical injury or

3    illness from the emotional distress." *Chowdhry v. NLVH, Inc.*, 851 P.2d 859, 483 (Nev. 1993).

4          Glover argues that although searching a home for weapons and valuables may leave it in

5    disarray, that does not rise to the level of outrageous conduct contemplated by this tort.  He

6    further argues that the removal of family heirlooms with substantial sentimental value is (at least

7    arguably) authorized by statute and therefore not extreme and outrageous.  He contends that the

8    Mathis Brothers do not qualify for bystander liability because they were not present to witness the

9    alleged harm, and the alleged harm was not violent or shocking.  Lastly, he argues that he could

10   not have had the requisite intent because, at the time of the search, (1) he was not aware that the

11   family had been contacted and would be in town soon; (2) he intended only to turn the property

12   over to the family; and (3) he first met one of the Mathis Brothers at his storage facility.  He cites

13   to his own deposition as evidence of these facts. (Dkt. No. 160-1.)

14         Plaintiffs contend that the statute authorizes only "securing" property, not removing it.

15   The Court previously held in this case, however, that removing property is within a public

16   administrator's discretion to "secure" property. (Order Granting Pls' Mot. for Recons. 11, Dkt.

17   No. 186.)  Plaintiffs next contend that they qualify for bystander liability and that there are

18   questions of fact as to whether Glover had the requisite intent (or acted recklessly) and whether

19   his conduct was extreme and outrageous.  They point out, in reliance on their depositions, that

20   they manifested physical symptoms due to the emotional distress allegedly caused by Glover.

21   Finally, they contend that bystander liability is not an issue as to the Plaintiffs' own personal

22   property.

23         "[B]ystanders may recover for the [IIED] caused by *witnessing* the defendant's outrageous

24   conduct to another where the bystander was a close relative of the person against whom the

25   outrage was committed and where the defendant's conduct was 'violent and shocking.'" *State v.*

26   *Eaton*, 710 P.2d 1370, 1375 (Nev. 1985) (quoting *Star v. Rabello*, 625 P.2d 90, 92 (Nev. 1981))

27   (emphasis added), *overruled on other grounds by State ex. rel. Dep't of Transp. v. Hill*, 963 P.2d

28   480 (Nev. 1998.  The Nevada Supreme Court and this Court have consistently applied the

requirement that the third-party personally observe the harm. *See, e.g.*, *Cardinale v. La Petite Academy, Inc.*, 207 F. Supp. 2d 1158, 1160 (D. Nev. 2002); *Nelson v. City of Las Vegas*, 665 P.2d 1141, 1145 (Nev. 1983).

Here, however, the Mathis Brothers were not third-party bystanders.  They do not allege emotional harm in response to harm done to another (for example, their father).  They contend they are the direct victims of the harm committed by Glover—that Glover intended to harm them directly by his actions.  Bystander liability does not apply on these facts.  At the time of the events at issue, the brothers had vested ownership and possessory interests in the House and the personal property that Glover removed.  They had ownership and possessory interests (a right to possession if not actual possession) in their own personal property stored at the home.

Glover's argument that the sequence of events entirely precludes a finding of intent is unavailing.  Glover could have recklessly disregarded the emotional state of the deceased's family members without even knowing who they were or when they would arrive.  That he may have intended to return all of the property to them in a timely manner does not negate the shock of arriving to a home in disarray with valuables missing.  A jury could reasonably conclude that he had the requisite intent (or acted recklessly).  In light of the evidence of physical symptoms, which slides the scale toward requiring less outrageous conduct, a jury could also reasonably find that Glover's conduct was sufficiently outrageous.  That Plaintiffs were not present when Glover committed the acts is a fact for the jury to weigh.  Therefore, summary judgment on the IIED claim is denied.

## 2.   Trespass to Chattels / Conversion (Eighth and Eleventh Claims for Relief)

Trespass to chattels is the same as conversion except that conversion requires a greater amount of interference with one's personal property.  "One who dispossesses another of a chattel is subject to liability in trespass for the damage done.  If the dispossession seriously interferes with the right of the other to control the chattel, the actor may also be subject to liability for conversion." RESTATEMENT (SECOND) OF TORTS § 222 (1965).  "A conversion occurs whenever there is a serious interference to a party's rights in his property." *Bader v. Cerri*, 609 P.2d 314,

1    317 (Nev. 1980), *overruled on other grounds by Evans v. Dean Witter Reynolds*, 5 P.3d 1043

2    (Nev. 2000).  "The return of the property converted does not nullify the conversion.  [But] [s]uch

3    return does serve to mitigate damages." *Id.*  Trespass to chattels and conversion are intentional

4    torts, but "it is not necessary that the actor intended to commit what he knows to be a trespass or a

5    conversion.  It is, however, necessary that his act be one which he knows to be destructive of any

6    outstanding possessory right, if such there be." RESTATEMENT (SECOND) OF TORTS § 222 cmt. c

7    (1965).

8        Glover first argues that there is insufficient evidence to show that he *retained* any of the

9    alleged missing property, but that is not a dispositive issue.  He could be liable for trespass to

10   chattels or conversion for even a short-term interference with Plaintiffs' property, although the

11   measure of damages would reflect the shorter duration of the interference. *See Bader*, 609 P.2d at

12   317.  Any defenses Glover may have that rely on the legality of his conduct, either statutory or

13   constitutional, depend on unresolved factual questions (as discussed above).

14       Glover next argues that none of the plaintiffs had a possessory right in the personal

15   property seized.  This is incorrect.  Future possessory interests are cognizable under trespass to

16   chattels, and the Mathis Brothers had vested interests in the personal property held in trust.

17   RESTATEMENT (SECOND) OF TORTS § 220 (1965) ("One who commits a trespass to a chattel is

18   subject to liability to another who is entitled to the future possession of the chattel for harm

19   thereby caused to such other's interest in the chattel.").  The Mathis Brothers had either present or

20   future possessory interests in their own personal property stored at the home.  Plaintiffs have

21   sufficient possessory interests to claim trespass to chattels and conversion.

22       Glover lastly argues that he could not have intended to commit trespass to chattels or

23   conversion because he had no reason to know that any of the property he seized belonged to

24   anyone other than Joseph.  But since Joseph had already died, the possessory rights in the

25   personal property had to belong to somebody or something.[5]  It is not necessary that Glover knew

26

27          [5] The Court admits it is possible that a person could die intestate with no heirs, and thus that
     person's property would escheat to the state.  But barring that unlikely scenario, the possessory rights to a
28   deceased's property must lie with someone or something (e.g., an heir, corporation or trust).

who had the possessory rights in the property, only that he knew he was interfering with those rights (whoever they belonged to).  A reasonable jury could conclude that Glover had the requisite intent.

NRS §§ 143.070 and 143.100 permit a personal representative of the decedent to bring a conversion claim and provide for treble damages in some instances.  The operation of these statutes is not relevant for this Order.

Summary judgment is denied for the trespass to chattels and conversion claims.

### 3.        Claim and Delivery (Ninth Claim for Relief)

Plaintiffs assert "claim and delivery" under NRS § 31.840, a replevin statute which provides in relevant part that "the plaintiff in an action to recover the possession of personal property may, at the time of issuing the summons, or at any time before answer, claim the delivery of such property to the plaintiff as provided in this chapter."

Glover contends that he does not retain any of Plaintiffs' personal property.  If he is correct, there would be no property to deliver to Plaintiffs.  However, Glover admits that he gave Plaintiffs a complete list of seized items and then found more of their property in storage.  Plaintiffs prepared a list of the allegedly missing items, which Glover submitted as part of his answers to interrogatories. (Dkt. No. 160-1 at 140.)  In light of this list and Glover's previous inaccurate statement that he had returned all of Plaintiffs' property, there is a genuine dispute whether Glover still retains any of Plaintiffs' personal property.  Summary judgment on the "claim and delivery" claim is denied.

### 4.        Injunction (Tenth Claim for Relief)

The reasoning for the injunction claim is the same as for replevin.  If Glover retains any of Plaintiffs' personal property, then an injunction may be an adequate remedy.  Summary judgment on the injunction claim is therefore denied.

### 5.        Trespass to Land (Twelfth Claim for Relief)

"[T]o sustain a trespass action, a property right must be shown to have been invaded[.]" *Lied v. Clark County*, 579 P.2d 171 (Nev. 1978).  The *Restatement* is more specific:

> One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally
>
>> (a) enters land in the possession of the other, or causes a thing or a third person to do so, or
>>
>> (b) remains on the land, or
>>
>> (c) fails to remove from the land a thing which he is under a duty to remove.

RESTATEMENT (SECOND) OF TORTS § 158 (1965).[6]

> [A] person who is in possession of land includes only one who
>
>> (a) is in occupancy of land with intent to control it, or
>>
>> (b) has been but no longer is in occupancy of land with intent to control it, if, after he has ceased his occupancy without abandoning the land, no other person has obtained possession as stated in Clause (a), or
>>
>> (c) has the right as against all persons to immediate occupancy of land, if no other person is in possession as stated in Clauses (a) and (b).

*Id.* § 157.

Glover argues that he was statutorily authorized to enter the property of the deceased and that none of the Plaintiffs "had the specific legal right to possess the land or residence owned by Joe Mathis." (Dkt. No. 160 at 24.)  Whether NRS § 253.0405 authorized the entry depends on the resolution of several factual questions (see above).  By operation of the Will and Trust Instrument, the possessory interest in the home transferred to the Mathis Trust; consequently, the Trustee could enforce the Trust's right to exclude others under *Restatement* § 157(c).  All three Mathis Brothers had vested possessory interests in the home, which also may be sufficient to exclude all others under *Restatement* § 157(c).  Summary judgment on the trespass to land claim is denied.

---

[6] The Nevada Supreme Court often relies on the *Restatement (Second) of Torts*, and on at least one occasion relied on it to decide whether an accused trespasser to land had privilege to enter the property. *S.O.C., Inc. v. Mirage Casino-Hotel*, 23 P.3d 243, 247 (Nev. 2001); *see also Halcrow, Inc. v. Eighth Jud. Dist. Ct.*, 302 P.3d 1148, 1153 (Nev. 2013); *Cucinetta v. Deloitte & Touche, L.L.P.*, 302 P.3d 1099, 1099 (Nev. 2013).

**6.     Intrusion Upon Seclusion of Another (Thirteenth Claim for Relief)**

Nevada recognizes the privacy tort of unreasonable intrusion upon the seclusion of another ("intrusion"). *People for the Ethical Treatment of Animals v. Bobby Berosini, Ltd.*, 895 P.2d 1269, 1279 (Nev. 1995) ("*PETA*").  "To recover for the tort of intrusion, a plaintiff must prove the following elements: (1) an intentional intrusion (physical or otherwise); (2) on the solitude or seclusion of another; (3) that would be highly offensive to a reasonable person. *Id.*  "In order to have an interest in seclusion or solitude which the law will protect, a plaintiff must show that he or she had an actual expectation of seclusion or solitude and that that expectation was objectively reasonable." *Id.* The Nevada Supreme Court adopted these elements from the *Restatement (Second) of Torts. Id.* at 1278.  "The defendant is subject to liability … only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs." RESTATEMENT (SECOND) OF TORTS § 652B cmt. c (1965).

Glover argues that any expectation of solitude was objectively unreasonable because Plaintiffs did not have the right to possess the home and that Glover could not have intended to intrude upon anyone's solitude because the home was unoccupied.  Plaintiffs did not respond to Glover's arguments in their response brief. (*See* Dkt. No. 170.)  Plaintiffs' failure to respond constitutes a waiver of this claim. *Stichting Pensioenfonds ABP v. Countrywide Financial Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011).  More importantly, on this point Glover's arguments have merit.  Therefore, summary judgment is granted in the County's favor on the claim for intrusion upon seclusion.

**7.     Negligence (Fourteenth Claim for Relief)**

Glover contends that Plaintiffs' inability to prove that he retained any personal property precludes this claim.  As discussed above, however, a factual issue remains as to whether Glover retains any of the personal property.  Thus, summary judgment is unavailable to Glover.

**8.     Breach of Fiduciary Duty (Sixteenth Claim for Relief)**

Under Nevada law, "[a] fiduciary relationship exists when one has the right to expect trust and confidence in the integrity and fidelity of another." *Powers v. United Services Auto. Ass'n*, 979 P.2d 1286, 1288 (Nev. 1999).  In other words, "[a] fiduciary relationship is deemed to exist

1    when one party is bound to act for the benefit of the other party.  Such a relationship imposes a

2    duty of utmost good faith." *Hoopes v. Hammargren*, 725 P.2d 238, 242 (1986).  "The essence of a

3    fiduciary or confidential relationship is that the parties do not deal on equal terms, since the

4    person in whom trust and confidence is reposed and who accepts that trust and confidence is in a

5    superior position to exert unique influence over the dependent party." *Id.* (internal quotation

6    marks and citation omitted).  The existence of dominance or superiority in the relationship is a

7    principal characteristic of a fiduciary relationship. *See U.S. v. Kim*, 184 F. Supp. 2d 1006, 1011

8    (N.D. Cal. 2002).

9         The Nevada Supreme Court has held that fiduciary duties arise as a matter of law in

10   certain categories of relationships. *See, e.g.*, *Powers v. United Servs. Auto. Ass'n*, 979 P.2d 1286,

11   1288 (Nev. 1999) (insurers and insured); *Cook v. Cook*, 912 P.2d 264, 266 (Nev. 1996) (attorney

12   and client); *id.* (spouses); *Fick v. Fick*, 851 P.2d 445, 449–50 (Nev. 1993) (fiancés); *Leavitt v.*

13   *Leisure Sports Inc.*, 734 P.2d 1221, 1224 (Nev. 1987) (corporate officers or directors and

14   corporation).

15        Glover argues that he did not owe any fiduciary duties to Plaintiffs because his duties did

16   not arise from a voluntary undertaking on their behalf but instead arose from statute.  Glover

17   relies on *Boorman v. Nevada Memorial Cremation Society*, which held that coroners are not

18   fiduciaries of the family members of a decedent because coroners' investigative duties are

19   imposed by law. 236 P.3d 4 (Nev. 2010).

20        Plaintiffs respond that the statute permits, but does not require, public administrators to

21   secure property of a deceased.  Accordingly, Plaintiffs argue, *Boorman* is inapposite and Glover

22   assumed a fiduciary duty to Joseph's heirs and devisees when he voluntarily seized personal

23   property.  Plaintiffs contend that "[p]ublic officials that handle public property and funds

24   belonging to others have been found, under the common law, to owe fiduciary duties to the

25   public." (Dkt. No. 170 at 22.)  The cases that Plaintiffs cite only tangentially support their

26   position, though.  In *State v. Gaul*, a county treasurer violated his fiduciary duty to preserve

27   public moneys. 691 N.E.2d 760, 768 (Ohio Ct. App. 1997).  And in *Columbia Casualty Co. v.*

28   *County of Westmoreland*, the court similarly held that public officials owe fiduciary duties to the

public and must account for public moneys they hold as individuals.  These cases do not hold, or even imply, that a public official owes a fiduciary duty to a private party on whose behalf the official ostensibly stores or possesses personal property.  The analysis does not stop here, however.

Although *Boorman* is not on all fours with the instant facts, its discussion of "voluntariness" informs the Court's determination that Glover owed fiduciary duties to Plaintiffs.  Like public administrators, coroners retain some discretion within their statutory mandate.  "[A] county coroner is obligated to 'make an appropriate investigation' when there are 'reasonable ground[s] to suspect that a death has been occasioned by unnatural means." *Boorman*, 236 P.3d at 9 (quoting NRS § 259.050(1)).  Once the coroner determines that a death may have been "unnatural," she is *obligated* to perform an "appropriate" investigation.

Conversely, once a public administrator determines that there is no one available to protect the deceased's property and that the property is in danger, she is *permitted* (but not obligated) to take appropriate action to secure the property.  The public administrator chooses to place herself in a position of superior knowledge and power.  In many cases (if not the vast majority), the public administrator may be the only person who knows the location of seized property.  Heirs and devisees may not have any way to check on the safety of their property or control where and how it is stored.  Likewise, the public administrator is often placed in the position of searching a deceased's house alone with no supervision and choosing if and how to "secure" the real property and personal property.  In this context, it must be that public administrators are bound to act for the benefit of the owners of seized property.  Glover's broad duties arose under Nevada statute, but once he chose to "secure" the property by entering the home and seizing personal property, he assumed fiduciary duties toward Plaintiffs.[7]

---

[7] The only case the Court found addressing this issue came to the same conclusion. *In re Estate of Blumenstein*, 959 N.Y.S. 2d 87 at *4 (N.Y. Surrogate Ct. 2012) (unreported) ("The Public Administrator, as fiduciary, had the duty to safeguard and protect assets of the estate, including the decedent's residence.").

Questions of fact remain as to whether Glover breached his fiduciary duties and (if so) whether that breach caused harm as alleged by Plaintiffs.  Summary judgment is denied on the claim of breach of fiduciary duty.

### 9.   Negligent Supervision and Training Against Lyon County (Fifteenth Claim for Relief)

"It is a basic tenet that for an employer to be liable for negligent hiring, training, or supervision of an employee, the person involved must actually be an employee." *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1181 (Nev. 1996).  Because Glover was an elected official rather than an employee, the County cannot be liable under this tort.  The Nevada Supreme Court has not extended the tort of negligent supervision to elected officials, and this Court is not inclined to extend it absent clear direction from the Nevada Supreme Court.  Therefore, Plaintiffs' motion for summary judgment on this claim is denied.

### 10.   Constructive Fraud (Seventeenth Claim for Relief)

"Constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or to violate confidence." *Executive Mgmt., Ltd. v. Ticor Title Ins. Co.*, 963 P.2d 465, 477 (Nev. 1998) (internal quotation marks and citation omitted).  "Constructive fraud may arise when there has been a breach of duty arising out of a fiduciary or confidential relationship." *Id.* (internal quotation marks and citation omitted).

Glover makes no argument as to this claim aside from asserting that he owed no fiduciary duties to Plaintiffs.  Because the Court holds (above) that Glover owed Plaintiffs a fiduciary duty, summary judgment is denied on the constructive fraud claim.

### 11.   Fraudulent or Intentional Misrepresentation (Eighteenth Claim for Relief)

Under Nevada law, the elements of fraudulent misrepresentation are:

(1) A false representation made by the defendant; (2) defendant's knowledge or belief that its representation was false or that defendant has an insufficient basis of information for making the representation; (3) defendant intended to induce plaintiff to act or refrain from acting upon the misrepresentation; and (4) damage to the plaintiff as a result of relying on the misrepresentation.

1     *Barmettler v. Reno Air, Inc.*, 956 P.2d 1382, 1386 (Nev. 1998).

2          Glover asserts that Plaintiffs' Complaint failed to allege damages or reliance. (Dkt. No.

3     160 at 28.)  Plaintiffs respond that the alleged misrepresentations pleaded in the Complaint imply

4     damages and reliance. (Dkt. No. 170 at 22 (citing Compl. ¶ 161).)  Plaintiffs conclusorily pleaded

5     at least $10,000 in damages in the Complaint, but provide no detail as to how they were damaged.

6     Even more deficient is the failure to plead reliance at all in the Complaint. (*See* Compl. ¶¶ 160–

7     167.)  Plaintiffs' response to the motion for summary judgment argues that they were "forced to

8     rely on Glover's statements because they had no way of knowing what property Glover may have

9     hidden and where that property could be[.]" (Dkt. No. 170 at 22–23.)  But this is too late for

10    Plaintiffs.

11         Glover established the absence of a genuine issue of fact as to reliance by pointing out

12    Plaintiffs' failure to plead reliance.  The Court cannot reasonably infer reliance based only on a

13    laundry list of alleged misrepresentations.  Allegations of reliance in the opposition to summary

14    judgment need not be deemed true.  Without any competent and admissible evidence from

15    Plaintiffs to counter Glover's establishment of the absence of a factual issue for reliance,

16    summary judgment must be granted on this claim.[8] *See Celotex*, 477 U.S. at 323–24.

17         Summary judgment on the fraudulent misrepresentation claim is granted in the County's

18    favor.

19         **E.      Lyon County's Motion to Strike**

20         The County moved to strike Plaintiffs' reply to one of its motions to dismiss. (Dkt. No.

21    199, seeking to strike Dkt. No. 197.)  The issue is already resolved, however, as the Court granted

22

23

24         [8] In his reply brief, Glover argues that Plaintiffs could not have relied on his statements
      because they never trusted him to begin with.  He submitted evidence indicating that they
25    threatened to sue him when they first met and filed a criminal complaint against him several days
      later. (Glover Decl., Dkt. No. 176-3 at 16–17; James Mathis Decl., Dkt. No. 170-3 ¶ 4.)  This
26    certainly seems like strong evidence that Plaintiffs did not rely on Glover's alleged
      misrepresentations, but the reliance issue need not reach a jury because Plaintiffs failed to
27    properly plead it.

28

1  Plaintiffs' motion to exceed the page limit shortly after the County filed its motion to strike.

2  (Dkt. No. 202).

3

4  **III.    CONCLUSION**

5          In accord of the foregoing, the Court hereby ORDERS:

6      1.  Glover's motion for summary judgment (Dkt. No. 160) is GRANTED IN PART and
           DENIED IN PART.  Judgment in Glover's favor is ordered for the Thirteenth Claim
7          (intrusion upon seclusion) and the Eighteenth Claim (fraudulent misrepresentation).
           Summary judgment is denied as to all other claims for relief challenged in this motion.
8

9      2.  Plaintiff's motion for partial summary judgment as to the Second, Third, and Fifteenth
           Claims for Relief (Dkt. No. 161) is GRANTED IN PART and DENIED IN PART.
10         Judgment is ordered in Plaintiffs' favor on the Second Claim (Fourteenth Amendment
           procedural due process against Glover).  Summary judgment is denied as to the Third
11         and Fifteenth Claims.[9]

12     3.  Lyon County's motion for summary judgment (Dkt. No. 189) is DENIED.

13     4.  Plaintiff's motion for partial summary judgment as to the Third and Fourth Claims for
           Relief (Dkt. No. 190) is DENIED.[10]
14

15     5.  Lyon County's motion to strike (Dkt. No. 199) is DENIED.

16          Dated: April 11, 2014.

17                                                     _____
                                                       ANDREW P. GORDON
18                                                     UNITED STATES DISTRICT JUDGE

19

20

21

22          [9] In its opposition to Plaintiffs' motion, the County argues that Richard Mathis should be
     dismissed from this suit because he did not reply to the County's first request for admissions and thereby
23   admitted he has no property interest at stake in this litigation. (Dkt. No. 171 at 4–5.)  The request for
     admissions was mailed to Richard on February 27, 2012. (Dkt. No. 171-1 at 4.)  Richard counters that he
24   timely mailed his response to the request on March 29, 2012, and attached his response to his reply brief.
     (Dkt. No. 177-17 at 7.)  Richard's response was timely as it was mailed 31 days after being served.
25   Although Rule 36(a)(3) allows only 30 days to respond, Rule 6(d) adds three days if service is effectuated
     by mail under Rule 5(b)(2)(C).
26
            [10] Although labeled as a motion for partial summary judgment as to the First Claim for Relief, this
27   was clearly an erroneous document title.  This motion argues about the Third and Fourth Claims for Relief.

28